# Exhibit 1

```
                        JAMS ARBITRATION
                         No. 1425024437
--------------------------------x
Connie Rodriguez,
                                    :
            Claimant,
                                    :
     -against-
                                    :
Manhattan River Group et al.
                                    :
            Respondents.
--------------------------------x
```

                    FINAL ARBITRAL AWARD


1. **Parties**: Connie Rodriguez (Claimant)

             Manhattan River Group (Respondents)

             Jerald Tenenbaum

             Josh Rosen

             Andrew Walters


2. **Attorneys**:       D. Maimon Kirschenbaum, Esq.   (Claimant)
                        Denise A. Shulman, Esq.
                        Joseph & Kirschenbaum
                        32 Broadway
                        Suite 601
                        New York, New York 10004

                        Lawrence Morrison, Esq.        (Respondents)
                        Robert L. Kraselnik, Esq.
                        Morrison Tenenbaum PLLC
                        87 Walker Street
                        2d Floor
                        New York, New York 10013


3. **Arbitrator**:      Michael H. Dolinger
                        JAMS
                        620 Eighth Avenue
                        34th Floor
                        New York, New York 10018

4. **Case Manager**:  Shavonne Applewhite
                      JAMS
                      620 Eighth Avenue
                      34th Floor
                      New York, New York 10018
                      212-607-2712,
                      212-751-4099 (fax)


5. **Pertinent Prior Proceedings**:

   Claimant Connie Rodriguez commenced this arbitral
proceeding, asserting claims against her former employers and
supervisor for, <u>inter alia</u>, violation of various Federal and New
York State provisions governing minimum-wage and notice
requirements and for gender discrimination under New York City
law. The parties were afforded a hearing on claimant's claims on
March 26, 2018, following submission of pre-hearing memoranda on
March 19 and 23, 2018. The parties supplemented their submissions
with post-hearing memoranda on April 9, 2018. We issued an
Interim Award on April 30, 2018, in which we principally found
the respondents liable on Ms. Rodriguez's claims under various
provisions of the New York Labor Law for underpayment of wages
and related notice violations, and not liable on her claims of
gender discrimination under the New York City Human Rights Law.
We further held that claimant was entitled to an award of
reasonable attorney's fees for the time spent on her successful
claims, and we directed that the parties file additional papers
to address the question of the appropriate amount of a fee award.
We have since received a fee-application submission from claimant
(May 11, 2018 letter from Denise A. Schulman, Esq.; May 11, 2018
Declaration of Denise A. Schulman, Esq.) and a submission in
opposition from respondents. (May 24, 2018 letter from Lawrence
Morrison, Esq.).


6. **Rulings**[1]:

   Ms. Connie Rodriguez commenced this employment arbitration
proceeding pursuant to her arbitration agreement with her former
employer Manhattan River Group ("MRG"). (Demand for Arbitration at
tenth to thirteenth pages). Doing business as La Marina, MRG

---

[1] The following text, with the exception of the section
addressing the amount of attorney's fees to be awarded, is taken,
in large measure <u>in haec verba</u>, from our Interim Award, issued on
April 30, 2018.

operates a restaurant and drinking establishment located by the Hudson River, in the vicinity of Dyckman Street in Manhattan.

In Ms. Rodriguez's Demand for Arbitration and Statement of Claim, she asserted claims inter alia under federal, state and local law for failure to pay minimum wage, failure to provide pay statements and notices, and gender discrimination in the conditions of her employment, which ended in her termination. In addition to MRG, she named as respondents two of the three owners of the company -- Messrs. Jerald Tenenbaum and Josh Rosen -- and her immediate supervisor while she worked there, Mr. Andrew Walters.

In substance, the claimant's pleading alleged that she had worked principally as a bartender at La Marina during the summer of 2016 and for a day and a few hours in May 2017, and that during that time she was not paid for her labors and thus was required to rely solely on tips. She further asserted that during her tenure there, she was subjected to sexually suggestive innuendo and unwanted physical contact by her supervisor, Mr. Walters, and that when she rejected his advances, she was terminated by him or through his instigation.

Following the completion of discovery, we conducted a half-day hearing on Ms. Rodriguez's claims. We also invited additional briefing by the parties, which they provided. Accordingly, in an Interim Award we addressed the claims, as modified by claimant at the opening of the hearing. We now reiterate our prior findings and address the amount of an attorney-fee award for claimant.


I. Claimant's Pleading

In Ms. Rodriguez's Statement of Claim she identified Messrs. Tenenbaum and Rosen as owners of MRG, and Mr. Walters as a "Director of Nightlife" at its La Marina establishment. She went on to report that she had worked at La Marina as a bartender "during the summer months of 2016 and for a few days in 2017." (Statement at paras. 5, 7, 14, 17).

In claimant's "Wages and Hours Allegations", she asserted that she "typically worked weekends, Friday through Sunday, and Mondays on long weekends." (Id. at para. 18). As for her hours of work, she stated that her "shifts often lasted longer than 10 hours, starting at 11:00 a.m. and continuing past midnight." (Id. at para. 19). She went on to allege: "Respondent did not pay Claimant any hourly wage. Her sole compensation was the tips she received from customers." (Id. at para. 20). Further elaborating on this point, she alleged that respondents had prepared and given her a W-2 form,

3

and had presumably filed it with the Internal Revenue Service, "even [though] Claimant received no wages at all." (Id. at para. 23). Ms. Rodriguez further stated that the restaurant did not provide her weekly wage statements or "the Notice and Acknowledgment of Pay form", both mandated by the New York Labor Law. (Id. at paras. 21-22).[2]

Ms. Rodriguez offered a somewhat more extended set of allegations in support of her assertion that she was subjected to "Sex Harassment/Wrongful Termination". She noted that she had informed Mr. Walters that she was taking off the July 4, 2016 weekend, and that he first said that she would lose her job if she did so, but then assured her not to worry, explaining "it's just that the weekend will suck without you. I have a way of falling in love with people, but then get over it." (Id. at paras. 27-28).

She then alleged that during the summer of 2016 Mr. Walters had "often" engaged in "touch[ing] Claimant inappropriately," by putting his arm around her waist, that he had invited her to travel with him to Thailand and that he "often invited [her] to a bar 'near [his] apartment . . . .'" (Id. at paras. 29, 31, 33). Claimant reported that she had rebuffed each of these advances. (Id. at paras. 30, 32, 34).

Claimant averred that after the summer of 2016, she was not contacted by Mr. Walters, but that he followed her on Instagram. (Id. at para. 35). She reported that she returned to work at La Marina "on or about the weekend of May 26, 2017." During her shift the first day -- apparently Saturday, May 27 -- Mr. Walters assertedly told her that he had been upset at her relationship with her then-current boyfriend -- presumably because he had seen her touting it on her Instagram account. She quoted him as saying "I'm not even going to small talk with you anymore, because you're

---

[2] The Statement of Claim went on to allege that, in committing these wage violations, respondents acted "willfully and against Claimant, the FLSA Collective Claimants and the Class Members." (Id. at para. 24). Since the current arbitral proceeding is brought solely on behalf of Ms. Rodriguez, we infer that these allegations are the orphan remains of a complaint previously filed in court. (We understand that claimant originally filed suit against the respondents in the Southern District of New York, but subsequently agreed to proceed by arbitration, in view of her pre-existing contractual commitment to do so, embodied in an arbitration agreement executed by her at the time that she was hired and signed an employment agreement. (See Demand for Arbitration at seventh to thirteenth pages).

basically wifed up." (Id. at para. 36). Apparently later that day, according to claimant, Mr. Walters "stated that he was 'just kidding" and attempted to hug [her]." (Id. at para. 37). Ms. Rodriguez further recounted that later that evening, she was attending to her bar and talking to a security guard when Mr. Walters "abruptly charged" at her and "shouted 'What are you gonna do, play with your pussy all day? Go do something go help the other bartenders. What are you, retarded?'" (Id. at paras. 39-40).

According to claimant, she returned to work on Sunday, May 28, 2017, and while she was setting up her bar, Mr. Walters stood "inappropriately close behind her, but saying nothing." Soon thereafter a security guard advised her that she was required to leave the restaurant, and she was escorted out. The following Friday, she met with the restaurant manager, "John Markowitz"[3], who confirmed that she had been fired, but tried to assure her that she should not be offended, because that occurred regularly at the restaurant. (Id. at paras. 42-47).

Based on these allegations, Ms. Rodriguez listed six claims. These included (1) a claim for failure to pay minimum wage under the Fair Labor Standards Act, 29 U.S.C. sec. 201 et seq., (2) an equivalent claim under the New York Labor Law, secs. 652 & 663, (3) claims for violations of section 195 of the New York Labor Law for failure to supply wage statements and a Notice and Acknowledgment of Pay statement, (4) a claim for violation of section 650 of the New York Labor Law by virtue of a failure to pay spread-of-hours compensation (NYCRR tit. 12, sect. 146-1.6), (5) a claim for violation of 26 U.S.C. sec. 7434 by filing a false W-2 form, and (6) gender discrimination through sexual harassment and termination, in violation of section 8-107 of the New York City Administrative Code. (See Scheduling Order No. 1 at para. 5).[4]

II. Respondents' Response

Respondents' answer to the Statement of Claim confirmed claimant's hiring and her work at the restaurant from April to September 2016, as well as her brief stint in May 2017 during the Memorial Day weekend. (Response at paras. 18, 28-36). Their pleading also referred to some of the details of the company's Non-

---

[3] The individual in question, John Mutovic, was the Director of Operations. (Stip. at para. 12).

[4] As noted below, claimant has effectively abandoned her spread-of-hours and tax claims.

Harassment Policy, which includes a provision for employees to submit any complaint to their supervisor, the company's Director of Operations, or the acting general counsel, who was identified as respondent Tenenbaum. (Id. at paras. 3-5, 8-11).

In answering the wage claims, respondents' pleading was, to say the least, cautious. It asserted that Ms. Rodriguez had been provided a so-called LS 54 -- the form acknowledging notice of wages, overtime, tip credit and pay day -- and it proffered a copy of that form, which is mostly filled in and signed by Ms. Rodriguez. (Id. at paras. 5, 16-17 & Ex. C). The Response did not actually assert that respondents had provided wage statements to Ms. Rodriguez or that MRG had paid her a wage, but rather averred that she had never complained that she had not been paid or that she had not received the wage statements. (Id. at para. 20 & Walters Aff. at para. 9).

As for the claims of harassment, respondents proffered Mr. Walters' version of events. Their answer, accompanied by an affidavit of Mr. Walters, said that the two had had "an amicable relationship throughout the 2016 season, and that Ms. Rodriguez had occasionally "engaged in flirtatious behavior with Mr. Walters, both on and off the clock." (Response at para. 22). The allegation about off-premises conduct referred to some text messages between Ms. Rodriguez and Mr. Walters, in one of which she had called him by the sobriquet "bae", assertedly meaning "boyfriend". (See id. at para. 23 & n.2; Walters Aff. at para. 11 & Ex. F).

Respondents went on to state that Ms. Rodriguez chose to return for the 2017 summer season and was permitted to do so. (Response at para. 25). They reported that she had come to work for the Memorial Day weekend, but had failed to attend any of the required employee training sessions. In their account, during her first work day, which was Saturday, she arrived late, missed the pre-shift staff meeting and failed to clock in, even though they had provided her with a point-of-sales number for that purpose. (Id. at paras. 26, 28; Walters Aff. at paras. 14-15). According to respondents, some hours later Mr. Walters detected that Ms. Rodriguez was ringing in some beverage sales at amounts below the listed prices, suggesting that she was charging customers the correct price but pocketing the difference. He also observed her texting on her phone despite the crush of customers, who were being served by the other bartenders. (Response at paras. 29-30). Respondents reported that she was admonished, and that the end-of-the-day reports showed that she had generated fewer sales than any other bartender. They also alleged that she had failed to reconcile her cash receipts for the day, again suggesting some impropriety in the handling of cash sales. (Id. at paras. 31-33; Walters Aff. at

paras. 18, 20-21). Finally, respondents said that the following day claimant again failed to clock in. She was later observed in conversation with a fellow bartender, and Mr. Walters then received a report that she had suggested "a scheme to inflate tips" by "charg[ing] the customer a higher cash price and then pocket[ing] the suggested gratuity." (Response at para. 35 & Walters Aff. at para. 23).[5] According to respondents, this chain of events on Saturday and Sunday led to the order that she be escorted off the premises and terminated. (Id. at paras. 36-37).

III. Proceedings Before the Hearing

Three events of note occurred before the scheduled commencement of the arbitral hearing on March 26, 2018. First, in the wake of the non-appearance of respondent Rosen for a noticed deposition on January 31, 2018, claimant moved for an order requiring his appearance and for reimbursement of the appearance fee of a court reporter who was to cover that deposition. (Feb. 2, 2018 letter from Denise A. Schulman, Esq.). We granted both applications (see Scheduling Order No. 3), and claimant has since proffered the court reporter's invoice, which is for $185.00. (See Feb. 23, 2018 letter from Denise A. Schulman, Esq.).

Second, claimant moved for an order precluding respondents from introducing into evidence their Exhibit 8, as cited on their pre-hearing exhibit list, which was described as a chart listing direct deposits on behalf of MRG to Ms. Rodriguez's bank account during portions of the relevant period. The relevance of this document was said to be its refutation of a statement by Ms. Rodriguez at her deposition that she had not received any direct deposits from her work at La Marina. Claimant's application was premised on respondents' failure to produce this document to her attorney even though they had listed it as an exhibit on their exhibit list. (See March 19, 2018 letter from Denise A. Schulman, Esq.; March 20, 2018 letter from Lawrence F. Morrison, Esq.). We granted claimant's motion, while allowing respondents to use any documents in their possession for cross-examination. (Scheduling Order No. 5).

Third, at a telephone conference with the arbitrator, counsel for the parties confirmed that they would not retain a court

---

[5] At the hearing, Mr. Walters' description of the nature of claimant's alleged proposal was that she had suggested persuading management to allow the bartenders to include a discretionary tip or list of tips on the customers' bills.

reporter to cover the hearing or arrange for alternative means of transcribing what was said at the hearing. Accordingly we advised them that, unless JAMS had an adequate recording system -- which it did not -- there would be no complete record of the hearing (see JAMS Employment Arbitration Rule 22(k)), and we memorialized their decision in a separate order. (See Scheduling Order No. 6).

IV. <u>Pre-Hearing Statements</u>

Following the completion of discovery, the parties submitted pre-hearing statements. They largely tracked the parties' respective contentions from the pleadings, but with two notable differences in claimant's posture. First, she no longer contended that she had not been paid any wages. Indeed, she appeared to acknowledge the accuracy in this respect of the MRG payroll register, which showed in detail payments made by the restaurant to her or on her behalf in the form of withholding. She nonetheless noted that for a number of the listed weeks, the register showed an amount of withholding for tax purposes but listed zero as payments directly to her. For those weeks, she treated that figure as demonstrating that she had received no payment, and on that basis calculated an amount that she contended she was owed for those weeks. (Cl. Pre-Hearing Memo at 4-6). Second, she calculated the amounts allegedly owed to her but unpaid for each week based on the contention that respondents had taken a tip credit but were not entitled to do so, since they had failed to provide her the required notice of pay, overtime rate and tip credit. (<u>Id.</u>).[6]

V. <u>The Hearing</u>

Although claimant had originally denied that she had been paid any wage by respondents, at the outset of the hearing her counsel reported that she would not pursue claims premised on the contention that she had not been paid on a weekly basis. Thus, claimant's counsel represented, in substance, that her client was withdrawing any claims regarding wages other than (1) a claim that she was entitled to be paid an amount undiminished by any tip credit, a credit that respondents had utilized in calculating her wages, and (2) a claim for some additional hours worked during two weeks that were listed in the payroll register maintained by

---

[6] Claimant also submitted a pre-hearing reply memorandum in which she argued that the sales records for May 27, 2017 did not suggest that she had engaged in financial chicanery. (Cl. Reply Memo at 2-3).

respondents.

This change of position appears to have amounted to a concession to the data reflected in La Marina's payroll register for 2016 (Claimant Ex. 1) and in the excluded Respondents' Exhibit 8, which was described as showing repeated weekly direct deposits into her bank account.[7] Ms. Rodriguez did contest the accuracy of the payroll register insofar as it listed her work hours in weeks 19 and 20, representing her first two weeks of work in 2016. (Cl. Ex. 1). Moreover, through her counsel she reiterated her position that La Marina was not entitled to take a tip credit, and that she is accordingly owed the difference between what was paid and the amount that should have been paid absent the tip credit.

### A. The Hearing: Claimant's Case

Claimant relied principally on her own testimony at the hearing.[8] In the course of that testimony she described herself as a singer, songwriter, actress and model, as well as an experienced server at numerous clubs, other entertainment venues and restaurants. She reported that she had been hired by Mr. Walters in about April 2016 to work as a server at La Marina for the summer season. During the period from May to September of that year, she performed mostly as a bartender in the so-called beach area of La Marina, an outdoor expanse adjoining the Hudson River, although occasionally also in the lounge section.[9]

Ms. Rodriguez reported that during the 2016 summer season, she had worked two days a week (Friday and Saturday) except for holiday

---

[7] For reasons unclear, the payroll register, while showing payments to the server -- whether by check or in cash -- as well as tax withholdings, did not show direct deposits and thus, in the column for payments to the employee, it listed zero for weeks when payment was made by direct deposit. (Cl. Ex. 1).

[8] Claimant also called a paralegal to authenticate her Exhibit 7, which was a spreadsheet summarizing sales that Ms. Rodriguez had made on May 27, 2017, the day before she was fired. The spreadsheet was based on a listing of all sales made by servers on that date. (Cl. Ex. 6).

[9] We understand that the premises include a restaurant, a lounge and the beach area, with food and drinks served. In the beach area there were several bars, including a so-called coconut bar, from which beer, cocktails, Red Bull and water were served. The other bar also served hard liquor.

weekends, when she worked a third day. Her shift varied depending
on what events were occurring at La Marina, but she estimated that
she had worked an average of perhaps ten hours at a time. She
further claimed that Mr. Walters and the Director of Operations,
John Matuvic, had told her on a number of occasions that she was
one of the best servers on the premises.

According to Ms. Rodriguez, when hired she was required to
sign a blank form purporting to give her notice of her wage rate,
overtime rate, tip-credit deduction rate, payday and whether pay
was to be weekly or on another schedule. She testified that she was
never given a copy of the completed form, now in the record as Cl.
Ex. 3. She also testified that she was not given weekly pay
statements after the first three weeks.

As for claimant's interactions with Mr. Walters, she testified
that he had initially behaved correctly and that they had had a
"friendly work relation". Nonetheless, she said, at some point in
the early summer of 2016, after the July 4 weekend, he had become
more forward, offering her compliments on her appearance[10], later
commiserating with her about her evident upset at having broken up
with her then-boyfriend, and at one point offering her a trip to
Thailand, where he was planning to travel. She reported that she
had declined the offer.

She claimed as well that before the breakup with her
boyfriend, she had asked to take off the July 4 holiday weekend,
apparently for a planned trip with the boyfriend. She reported that
Mr. Walters had first said that she could lose her job if she did
so, but then in effect admitted that he was kidding, allowing that
she should not worry, as he tended to fall in love quickly and get
over it easily.[11]

Ms. Rodriguez further testified that Mr. Walters frequently
touched her "inappropriately", by putting his arm around her waist,
despite her telling him not to do so. In particular, she mentioned
one occasion in mid-August when he did so while apparently drunk,
and she pushed him off, saying "Leave me alone", to which he
responded by asking her "What's wrong with you today?" According to
claimant, he also invited her "a handful of times" to join him in

---

[10] The examples of compliments provided by Ms. Rodriguez were
quite mild, specifically, that Mr. Walters would tell her that
she "looked nice" or that he "liked [her] hair".

[11] Ms. Rodriguez herself described this repartee as a form of
joking.

his residential neighborhood for a drink -- an invitation that she
declined -- and on at least one very early occasion shared stories
with her of his own romantic escapades, referring to his woman
friends as "bitches and hos" and mentioning that he traveled to
Thailand for the women there. He also followed her on her Instagram
account, although he apparently did not send her any offensive
messages by that route.

According to Ms. Rodriguez, she did not complain to management
about this behavior despite La Marina's no-harassment policy, and
limited herself to mentioning to some friends that her boss was
sometimes "weird". She explained that she had not bothered to
complain because her job was to last only "one month" (apparently
from the time when Mr. Walters became more intrusive) and the pay
was good.

Following the end of the summer season, Ms. Rodriguez
reported, she asked Mr. Walters whether she could return for the
2017 season. As she had other work plans for the 2017 summer, she
was intending to work at La Marina only during the Memorial Day
weekend, because it was the busiest time and thus offered her a
tempting money-making opportunity, but she did not inform Mr.
Walters of these plans, leaving him to assume that she would work
the full summer. She testified that he agreed to her return, and
they exchanged seemingly friendly text messages on a few occasions.
Indeed, on one such occasion she asked him whether she could bring
a friend to La Marina for free drinks, which he said was fine, and
she thanked him using the term "bae" and added a kissing emoji.
(See Cl. Ex. 4).

According to Ms. Rodriguez, she arrived for work on Saturday,
May 27, 2017 -- the first of her planned three days of work at La
Marina -- and attempted to clock in, but the business office did
not have a code number for her to do so. She was assigned to the
coconut bar at the beach section, and she set up there. During the
set-up, she says, Mr. Walters stood quietly behind her but said
nothing. At some point, in her account, he asserted that he would
not engage in small talk with her, because she was "wifed up", an
allusion, she claims, to the fact that she again had a boyfriend,
a fact supposedly known to Mr. Walters because he was following her
on her social media accounts. Some hours later, she reported, she
was in conversation with a security guard, when Mr. Walters
approached her and angrily demanded in very profane terms that she
stop conversing and texting, and start helping her fellow

11

bartenders.[12] She testified that she was deeply hurt by this tirade, started to cry and retreated to the main bar, where she spent the rest of her shift.

Her last day of work at La Marina was May 28. She reported that she was again unable to clock in but began her work, serving one customer at the main beach bar[13], only to be told by a security guard that she was to be escorted off the premises, apparently at the instigation of Mr. Walters, who had briefly and silently stood behind her while she set up but had not spoken to her. When she asked for an explanation, she was told to talk to Mr. Mutovic, the Chief of Operations, and to collect her pay the following Friday. She left, and returned at the end of the week, as instructed, to collect her pay for the short time that she had worked that weekend. While at the premises she met with Mr. Mutovic, who told her that he did not know the details of the reasons for her termination and that he did not "have a problem with [her]." (See Cl. Ex. 12). After receiving her pay, she left.

According to Ms. Rodriguez, she was so traumatized by the circumstances of her termination that she did not pursue her summer work plans, including an unspecified music project with Sony, modeling, and server work at some other venue. She asserted that, because of the trauma, she had also declined a possible acting job because the role involved kissing someone, and she announced to her boyfriend that she could no longer do any sort of work. She also stopped socializing, and implied that her inability to work for many months thereafter had also led to her breaking up with her then-boyfriend and damage to her relationships with her parents and friends. She reported that in the wake of the termination she suffered from panic attacks "every couple of days" and still does on occasion, and that she tried at least one session of psychotherapy and some Xanax, which did not work. She also stated that, as a consequence, she had given up her apartment and gone to live with her mother. Ultimately, she reported, in November 2017 she took a job as a server in a different establishment and has worked there since.

_____

[12] Claimant quoted Mr. Walters as saying, "Are you retarded? Are you going to play with your pussy all day? Go help the other bartenders."

[13] Ms. Rodriguez said that she was instructed at the start of the shift to assist at the main beach bar rather than run the coconut bar.

B. <u>The Hearing: Respondents' Case</u>

Respondents rely mainly on the testimony of Mr. Walters, although he did not address the details of respondents' record-keeping of time worked and pay calculations. He testified that he is an experienced manager of personnel at restaurants and clubs, and was hired by MRG for the 2016 summer season to supervise some of the staff at La Marina. He had previously seen Ms. Rodriguez serving at a club and thought her to be skilled. Accordingly, when she applied for work at La Marina, he hired her.[14]

According to Mr. Walters, during the summer 2016 season he thought Ms. Rodriguez's performance to be satisfactory, and had no significant complaints about her. Accordingly, when she indicated an interest in working there the next summer season, he agreed. He also added that, in rehiring her, he had assumed that she would work there the entire summer and that he would not have rehired her if he had known that she intended to work there for only one weekend.

He denied Ms. Rodriguez's accusations that he had engaged in unwanted or suggestive behavior toward her at any time. Thus, he asserted that he had not grabbed her, had not invited her for drinks, had not suggested that she accompany him on a trip to Thailand and had not shared stories of his girlfriends. He also denied having joked with her before the July 4 weekend about falling in and out of love.

As for the events of the 2017 Memorial Day weekend, Mr. Walters denied having refused to talk to Ms. Rodriguez on the 27th or referring to her as "wifed up". In explaining the events leading to the termination, he asserted that she had engaged in a series of actions that were plainly in violation of La Marina policy and harmful to its business interests. These included failing to attend any one of several training sessions before the start of the season, failing to attend the pre-shift meeting of servers, failing to obtain a code number to allow her to clock in[15], arriving late to work, talking on her cell phone and chatting with the security guard while the other bartenders were very busy.

---

[14] There seems to be some conflict on this point with Mr. Walters' deposition testimony, in which he indicated that the final decision on hiring was left to Mr. Mutovic. (Walters Dep. 24:10-19).

[15] He indicated that this failing was a result of her missing the training sessions.

13

Of particular concern, he asserted that he had determined through Saturday and after the end of her shift that she had been mishandling money at the bar registers. In seeking to explain this finding, he noted that beers sold at the beach area were priced somewhat higher than in the restaurant, and that the prices were prominently posted on a board behind the beach bars. He testified that through a computer system he had real-time access to the charges being run up via the point-of-sale system, and he noted that on a number of sales Ms. Rodriguez was entering purchases for beers at the lower restaurant prices rather than the beach prices. Based on his experience, he said, this indicated that she was siphoning money from the sales since she was undoubtedly charging the customers the posted higher prices but entering only the lower prices in the system (a practice known as "short ringing"). (See Resp. Ex. 2; see also Cl. Ex. 7 at 13th & 14th pages).[16] He further indicated that he had been advised at some point by the head bartender, named Marvin Fernandez, that Ms. Rodriguez had suggested to him that they change the system (or persuade Mr. Walters to change the system) so as to add a suggested tip to the billing. Finally, he mentioned at one point that Ms. Rodriguez had left hurriedly at the end of her Saturday shift and had not done the required reconciliation of her sales and funds. He seemed to suggest, albeit in vague terms, that when he went over these accounts they did not reconcile, seemingly confirming his suspicion about her.

According to Mr. Walters, he recommended to Mr. Mutovic that Ms. Rodriguez be terminated, and that decision was implemented early in her Sunday shift. He also speculated that Ms. Rodriguez may have been motivated to steal even small amounts because she was planning not to return to work after the end of that weekend.

VI. Post-Hearing Submissions

The parties were requested to make post-hearing submissions, particularly in view of claimant's change of position on her wage claims.

In Ms. Rodriguez's subsequent submission she contended that her unpaid wages totaled $759.60, that she was entitled to an award

---

[16] In a passage from Mr. Walters' deposition on which he was questioned, he testified that he had discovered the anomaly by doing a reconciliation of sales data after the May 27 shift had ended and Ms. Rodriguez had left the premises. (Walters Dep. at 77:13 - 79:24).

of liquidated damages as well, and that respondent's violation of the documentation requirements of sections 195(1) and (3) of the New York Labor Law justified an additional award of $7,600.00. As for her gender claims, she argued that Mr. Walters had not denied making at least two "degrading gender-based comments" and that these by themselves constituted a violation of the New York Human Rights Law. She further reiterated her contention that Mr. Walters had made additional objectionable statements during the summer of 2016, had engaged in grabbing her without permission, had offended her by complimenting her looks and inviting her to Thailand and had also violated statutory norms by telling her, in occasionally obnoxious terms, about his own romantic life. She further argued that Mr. Walters had been responsible for her termination and that, in context, he had done so, in whole or in part, because he was "infatuated" with her and thus, presumably, jealous. In further support of this contention, she argued that the documentary and other evidence demonstrated that Mr. Walters' accusation that she had engaged in "short ringing" was false and pretextual.

Respondents' post-hearing submission tracked their contentions from their pre-hearing submissions. They noted the lack of corroboration for Ms. Rodriguez's allegation that Mr. Walters had repeatedly harassed her in the presence of other staff members, including the absence of testimony or documents such as e-mails, text messages and journal entries[17], as well as the friendly, and arguably flirtatious, text messages from Ms. Rodriguez after the 2016 season. They also cited Ms. Rodriguez's failure to complain to management despite the existence of an explicit non-harassment policy, and the absence of any harassment complaint by any of the approximately 150 La Marina employees over five years (a factual assertion not reflected in the evidentiary record). Respondents offer the hypothesis that Ms. Rodriguez invented these allegations after her termination, and that she was stealing petty sums on her planned last weekend of work, thus justifying her removal from the premises.

As for the wage claims, respondents relied on the computerized record-keeping system, and noted claimant's original -- and now abandoned -- assertion that she had been paid no wages. As for the tip-credit question, they argued that claimant had not shown that

---

[17] At one point Ms. Rodriguez testified that she had kept some sort of diary, but she never produced any such document in discovery.

she was "ineligible" for the tip credit[18], and they went on to make a number of assertions that are entirely devoid of evidentiary support, arguing that she received either checks with pay stubs attached or pay statements in connection with direct deposits.[19] As for the number of hours that claimant worked, they argued that she should be bound by whatever hours are reflected in the electronic timekeeping system if "such hours comport with the hours worked by similarly situated employees" (Resp. Post-Hearing Memo at 4th page), but the record is bare of evidence as to the hours worked by other employees.

ANALYSIS

I. The Wage Claims

Claimant currently pursues claims under both the FLSA and the New York State Labor Law for failure to pay minimum wage. She also asserts claims for violation of section 195 of the New York Labor Law by virtue of respondents' failure to provide the required wage notice at the time of hiring and its asserted failure to provide weekly pay statements. We address each of these claims in turn.[20]

_____

[18] They observed that Ms. Rodriguez did not spend more than 20 percent of her work time performing non-tip work, which would take her out of the category of workers potentially subject to a tip credit. This is a red herring, as claimant never made such an argument, and instead relied on the asserted failure of La Marina to comply with statutory requirements of documentation under section 195 of the Labor Law.

[19] Respondents offered no evidence as to the documentation that accompanied paychecks or as to the procedures and paperwork involved in direct deposits. In any event, Ms. Rodriguez seemed to concede that she had received pay statements for the first three weeks of the 2016 season, but asserted that she had received none thereafter, when she was apparently being paid by direct deposit.

[20] Claimant no longer pursues her claim for spread-of-hours compensation. That is not surprising, since the payroll register reflects payment of spread-of-hours compensation for all pay periods in which the number of work hours listed would trigger such a payment under New York law. (Cl. Ex. 1).

A. Minimum Wage: Tip Credit[21]

Now that Ms. Rodriguez no longer contends that La Marina failed to pay her any wage, her claims for underpayment of minimum wage reduce to two contentions. First, she asserts that the payments that she received from the restaurant were premised on the assumption by MRG that it was entitled to take a tip credit, and she contests that assumption. If she is correct, necessarily she was underpaid. Second, she asserts that for two of the weekends that she worked for La Marina early in the 2016 summer season, she worked longer hours than MRG credited to her.[22]

We start by briefly summarizing how the payment system seemed to work at La Marina. Calculation of weekly payments was done by a computer for which inputs were initially made by a clock-in/clock-out system to determine hours worked. With established hourly wages (in Ms. Rodriguez's case all but the first week were paid at $7.50 an hour, see Cl. Ex. 1), and documentation of hours worked, the system calculated the total amount of hourly pay -- including spread of hours -- plus credit-card tips,[23] subtracted tax and related withholdings and a sum for meals, and thus determined net pay, which was typically distributed either by check or by direct

---

[21] In addressing Ms. Rodriguez's minimum-wage claim, we focus on the New York Labor Law, which embodies provisions equivalent to, and in certain respects more favorable than, the FLSA.

[22] At the hearing, Ms. Rodriguez also questioned the absence of a "week 28" on the payroll register, while noting that she had taken a vacation over the July 4 weekend. The register seems consistent with her absence on that weekend, as it lists a payment on July 1, presumably for the prior week's service (designated week 27), and then the next payment on July 15 (designated week 29), presumably for her work on the weekend after the July 4 weekend.

[23] Mr. Walters and Ms. Rodriguez noted that cash tips were divided by the bartenders as part of a tip pool after giving 20 percent to supporting bar employees. As for credit-card tips, according to Mr. Walters, the restaurant calculated the amounts due to each bartender and paid that sum as part of its weekly wage payments. This scenario is consistent with the payroll register. (Cl. Ex. 1).

17

deposit into the employee's account.[24]

Since Ms. Rodriguez and the other bartenders received tips, her employer was presumptively entitled to take a tip credit. In 2016, the minimum wage in New York City for restaurant employees whose employer had at least eleven employees was $9.00, with a minimum cash wage from the employer of $7.50. See N.Y.C.R.R. tit. 12, secs. 146-1.2, 146-1.3(b)(4) (2016); N.Y. Labor Law sec. 652(1).[25] According to the payroll register, except for the first week, when her pay was calculated at $9.00 per hour, she was paid at a rate of $7.50 (Cl. Ex. 1), which is consistent with MRG taking the $1.50 tip credit.

Whether this calculation by MRG is defensible turns on whether MRG complied with the requirements of section 195(1) of the New York Labor Law by providing to claimant at the start of her employment in 2016 and 2017 a notice of her gross wages, overtime rate, the amount of any tip credit, and other deductions as well as the date for pay. Under New York law, failure to take this step precludes the employer from claiming a tip credit. See N.Y.C.R.R. tit. 12, secs. 146-1.3 (tip credit available "if the employee has been notified of the tip credit as required in section 146-2.2") & 146-2.2 (employee must be given notice inter alia of "her pay rate and tip credit").[26]

With respect to the LS 54 notice form -- the form used by MRG to satisfy section 146-2.2 -- respondents proffered from their files during discovery the requisite form, dated April 16, 2016, which is mostly filled out and bears the signature of Ms. Rodriguez. (Cl. Ex. 3). She testified, however, that she was told to sign the form in blank and was never given a copy, much less provided with the filled-out version. Given that testimony, which

---

[24] On occasion, if circumstances required, payment was made in cash -- for example, when Ms. Rodriguez collected her last wages, for the 2017 Memorial Day weekend, after she had been terminated. (Cl. Ex. 9).

[25] For the following year the minimum wage was increased to $11.00, the required cash wage was $7.50, and the maximum tip credit was $3.50. See N.Y.C.R.R. tit. 12, sec. 146-1.3(b)(1)(i); N.Y. Labor Law sec. 652(1)(a); Dep't of Labor, Wage Order summary - Hospitality Industry, https://labor.ny.gov./forumdocs/wp.

[26] Federal law imposes the same requirement for an employer to claim a tip credit. See 29 C.F.R. sec. 531.59(b).

appears also in her deposition, we would expect some form of refutation by respondents. None, however, has been offered. The only proffered witness for respondents was Mr. Walters, and he never referred to this question, apparently because paperwork was handled by the La Marina business office, not by him.[27] Moreover, respondents do not even attempt to show that they provided a notice form to Ms. Rodriguez at the start of the 2017 summer season, when the minimum wage had changed from the prior year. See p. 18, n. 25, supra. Finally, we note that even if the filled-out 2016 notice proffered by respondents had been provided to Ms. Rodriguez, it would not have sufficed since it does not list the tip credit to be taken.[28]

In sum, we conclude that respondents cannot justify the taking of a tip credit.

### B. Number of Hours Worked

As noted, Ms. Rodriguez asserts that the payroll register undercounts her hours for two of the nineteen weeks listed. Specifically, she testified that the listing for her first two weeks -- 3.25 hours for week 19 and 17.72 hours for week 20[29] -- understate her actual work hours, which totaled 15 for the first week and 25 for the second. Respondents did not offer a specific rebuttal to these assertions, but appear implicitly to rely on their time records, as cumulated in the payroll register. Although hesitant to reject that documentation based solely on Ms. Rodriguez's fairly conclusory testimony, I note that for the first of these weeks the register lists only 3.25 hours for her, and I would expect that if she had worked for such a short time on her first week, Mr. Walters -- whose memory for historical details of the workplace and Ms. Rodriguez's history at La Marina seems quite acute -- would have recalled that fact, but he remained silent on this question. Since Ms. Rodriguez does not now challenge the

---

[27] Handing employees a blank LS 54 form is apparently not that uncommon, whether through oversight or with intention. See, e.g., Sui Qin Chin v. East Market Restaurant, 2018 WL 340016, *3-4 (S.D.N.Y Jan. 9, 2018).

[28] The notice is also defective in that it lists an erroneous overtime rate of $11.00.

[29] These two listings appear to refer to the last week of April and the first week of May 2016, as the checks for those two pay periods are dated May 6 and 13, 2016, respectively. (Cl. Ex. 1).

accuracy of any of the other listed hour totals -- which amount to 388.47 hours -- and respondents do not offer a specific rebuttal, I infer that her estimates of time are sufficiently credible to include the additional hours in calculating wages earned.

### C. Wages Unpaid

With these findings in place, we turn to the calculation of wages earned and the amount of the shortfall in what claimant was paid. In 2016, the applicable hourly minimum wage was $9.00. With the exception of designated week 19 -- when MRG paid her $9.00 per hour -- respondents paid her only $7.50 per hour. The register reflects for all other weeks a total of 385.22 compensated hours. For those hours the shortfall of $1.50 per hour totals $577.83. As for the additional 19.03 hours about which Ms. Rodriguez testified, the total of unpaid wages is $171.27.

Ms. Rodriguez's abbreviated tenure with La Marina in 2017 led to a payment of $7.50 per hour for three hours. (Cl. Ex. 9). That year the applicable minimum wage was $11.00, and hence her pay was short by $3.50 per hour. Thus she is owed an additional $10.50 for her work on May 27 and 28.

In sum, the unpaid minimum wages for the two seasons total $759.60.

### D. Liquidated Damages

Under current New York law, a prevailing plaintiff is entitled to a liquidated-damages award of 100 percent of unpaid wages unless her employer "proves a good faith basis for believing that its underpayment of wages was in compliance with the law." N.Y. Labor Law secs. 198(1-a), 663(1). In arguing for an award of these additional damages, claimant relied in part on her now-withdrawn contention that MRG paid her no wages, but she also noted her contention -- now adopted here -- that MRG's business office gave her a blank LS 54 form to sign and never gave her a copy of the filled-in version, and indeed never fully completed that form. (Cl. Pre-Hearing Memo at 7).

Respondents have the burden of proof on this question. See, e.g., Rana v. Islam, __ F.3d __, 2018 WL 1659667, *4 (2d Cir. April 6, 2018). They have offered no evidence to justify avoidance of such an award based on failings in connection with the requirements of section 195. We note that although the restaurant had an apparently sophisticated system for tracking hours, calculating tax withholdings, and computing wages, its business office apparently chose to engage in self-evidently non-compliant procedures --

20

failing to complete the LS 54 form before having the employee sign it, failing ever to complete the key portion of the form listing the amount of the tip credit, and failing to provide a copy of a completed form to Ms. Rodriguez. Such conduct is incompatible with the required showing by respondents that MRG had "a good faith basis for believing" that it was paying the correct wages to Ms. Rodriguez.

E. The Labor Law Section 195 Violations

We have determined that respondents failed to provide the required Notice of Wages, mandated by section 195(1) of the New York Labor Law. Violation of section 195(1) triggers liquidated damages of $50.00 per workday, up to a ceiling of $5,000.00. N.Y. Labor Law sec. 198(1-b).[30]

Claimant also testified that after the first three weeks, she received no weekly pay statements, a failing apparently coincident with MRG's direct deposit of her wages at that time. Respondents have offered no evidence -- documentary or testimonial -- to rebut that testimony, which suffices to demonstrate a violation of section 195(3), requiring the employer to furnish wage statements each pay week. Non-compliance with this requirement exposes the employer to an award of $250.00 "for each work day that the violations occurred", up to $5,000.00. Labor Law sec. 198(1-d).

The parties stipulated that Ms. Rodriguez had worked at La Marina for at least 49 days in 2016 and for two days in 2017. (Stip. at paras. 5-6). Although counsel for Ms. Rodriguez asserted before the hearing that claimant would testify to having "worked approximately 8 days in 2016 that are not reflected in the payroll register" (Cl. Pre-Hearing Memo at 2), she did not so testify, although she made vague -- and confusing -- reference to an omission of week 28 on the register.[31] We have no reason to

---

[30] The statute requires notice at the time of hire (N.Y. Labor Law sec. 195(1)), and states that "[i]f any employee is not provided within ten business days of his or her first day of employment a notice . . ., he or she may recover in a civil action damages of fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars . . . ." N.Y. Labor Law. sec. 198(1-b).

[31] For reasons noted above, we have found the payroll register to be consistent with her testimony that she absented herself from work during the July 4, 2016 weekend.

discredit the documentation of her work days on the register, and hence use 51 work days as the foundation for calculating statutory damages awarded to her under section 198.

Claimant worked 51 days with no LS 54 notice. At $50.00 per day, she is entitled to an award of $2,550.00 for violation of section 195(1). As for the section 195(3) violations, they occurred on 17 of the 20 weeks when she worked for La Marina. Since the statements were due each week and claimant worked 51 days, that amounts to well over 20 violations, with each day worked in the absence of a pay statement constituting a violation.[32] At $250.00 per violation, she is entitled to an award of $5,000.00 under section 198(1-d).

### F. Total Damages on Wage Claims

The foregoing analysis dictates that the total of compensable damages on claimant's wage claims is $9,069.20.[33]

---

[32] Although the requirement of a pay statement is triggered each week when the employee is paid on a weekly basis, the relevant section provides for an award for "each work day that the violation occurred." Presumably, if the employer fails to provide a wage statement, the violation is a continuing one and thus occurs each work day. In this respect we note that the predecessor statute provided, in significantly differently terms, that an aggrieved employee may recover "damages of one hundred dollars for each week that the violations occurred or continue to occur, but not to exceed twenty-five hundred dollars . . . ." 2010 Sess. News of N.Y. Ch. 564 (S. 8380), 223rd Legislature, Labor Law – Wage Theft Prevention Act sec. 198(1-b)(emphasis added). See, e.g., Rana v. Islam, 210 F. Supp.3d 508, 515 (S.D.N.Y. 2016), rev'd in part on other gds., __ F.3d __, 2018 WL 1659667 (2d Cir. April 6, 2018). The change in wording from "each week" to "each day" implies that the violation occurs each work day in the absence of the required pay statement.

[33] The calculation is:

|  |  |
|--|--|
| | $759.60 |
| | $759.60 |
| | $2,550.00 |
| | $5,000.00 |
| TOTAL | $9,069.20 |

G. Pre-Judgment Interest

Claimant seeks pre-judgment interest, which, under New York law, is mandated at an annual rate of nine percent. CPLR 5001, 5004. See, e.g., Galeana v. Lemongrass on Broadway Corp., 120 F. Supp.3d 306, 321 (S.D.N.Y. 2014). Such interest is available under the New York Labor Law even if the claimant is awarded liquidated damages. See, e.g., Zhen Ming Chen v. New Fresco Tortillas Taco LLC, 2015 WL 5710320, *9 (S.D.N.Y. Sept. 25, 2015)(citing cases).

For 2016, the appropriate start date for the running of interest is the midpoint of the period between April 27 and September 16, 2016. (See Cl. Ex. 1). That midpoint is July 7, 2016. As for the 2017 period, claimant's work was confined to May 27 and 28, 2017, and the start date can permissibly be set at May 27, 2017. Interest will continue to run until judicial confirmation of this Final Arbitral Award or its satisfaction, whichever comes first.

H. Individual Liability

Claimant asks to hold each of the three individual respondents liable for the damages assessed on her wage claims. (Cl. Pre-Hearing Memo at 8-10). Respondents do not directly address this question, perhaps assuming that no liability will be found, thus mooting the issue.

Individual, as distinguished from corporate, liability turns on whether the individual is an "employer". The New York Labor Law definition includes "any person . . . employing any individual in any occupation, industry, trade, business or service or any individual . . . acting as employer." N.Y. Labor Law sec. 190(3). Under the FLSA, which contains a similar definition, the courts follow a general four-factor test, which looks to whether the individual "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Herman v. RSR Soc. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999). Although the New York Court of Appeals has not determined whether the same criteria govern under the Labor Law, see Irizarry v. Catsimitidis, 722 F.23d 99, 117 (2d Cir. 2013), courts generally have so assumed. See, e.g., Sai Qin Chen, 2018 WL 340016 at *4; Rosas v. Alice's Tea Cup LLC, 127 F. Supp.3d 4, 13 (S.D.N.Y. 2015)(citing Sethi v. Narod, 974 F. Supp.2d 162, 188 (S.D.N.Y. 2013)).

The listed factors are not exclusive, and the claimant need not satisfy all to demonstrate employer status. E.g., Zheng v.

Liberty Apparel Co., 355 F.3d 61, 717-72 (2d Cir. 2003); Sai Qin Chen, 2018 WL 340016 at *4. Moreover, although to be an employer the individual "must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment", Irrizary, 722 F.3d at 109, he need not be shown to have actually exercised that power. See id. at 108. Thus, "an individual defendant who . . . 'made major corporate decisions' but 'did not have day-to-day control of specific operations'" can be deemed an employer because "the defendant's responsibilities, which included determining employee salaries, constituted "'operational control of significant aspects of the corporation's day to day functions.'" Id. (quoting Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 966 (6th Cir. 1991)(emphasis in original)).

Judged by these criteria, the individual respondents are properly deemed to be Ms. Rodriguez's employers. Mr. Walters had the power to hire and fire[34], he controlled the servers' schedules, and he also directed where they were to be assigned or reassigned during their shifts. Moreover, by his own testimony, he closely supervised their performance throughout their shifts and directed changes in operations on the spot as needed. These roles are sufficient to identify him as claimant's employer. See, e.g., Wang v. LW Rest. Inc., 81 F. Supp.3d 241, 254-55 (E.D.N.Y. 2015).

As for Messrs. Rosen and Tenenbaum, each individually owned approximately 26 percent of MRG and were two of the three members of the Board or Directors. (Stip. at paras. 8-9). Mr. Tenenbaum also served as general counsel to MRG. (Id. at para. 10). As Board members, they had the authority to hire managers (including Mr. Walters), to fire them and any other employees, and to set their pay. (Id. at paras. 13-15; Rosen Dep. 24:9-11). The Board would typically meet weekly or twice weekly during the summer season, and was responsible for significant financial decisions, as well as more mundane restaurant questions, such as "the proper way to set up a venue, layout, floor plan, to glassware, to products [the restaurant was] carrying, to different cocktails, changing the menu." (Walters Dep. 104:18-105:15). This close attention to the details of running the restaurant and their control of managerial

_____

[34] At one point Mr. Walters suggested that he was empowered only to recommended firing decisions to the Director of Operations, Mr. Mutovic, but he plainly decided to hire Ms. Rodriguez, and the recording of claimant's last conversation with Mr. Mutovic, when she collected her final wages after her termination, seems to indicate that Mr. Walters was free to act on his own in the termination decision and that he did so, merely informing the Operations Director of his decision. (Cl. Ex. 12).

employees and, potentially, of non-management employees suffice to deem them employers as well.


II. Gender Discrimination

Claimant's remaining claim is for gender discrimination, in violation of the New York City Human Rights Law, which is embodied in section 8-107(1)(a) of the Administrative Code. In substance, Ms. Rodriguez asserts that she was subjected over a significant portion of her work time with La Marina to a series of sexually suggestive and unwelcome remarks and physical contacts by her supervisor, Mr. Walters, and that her rejection of these approaches and contacts, as well as his knowledge of her ties to her boyfriend, culminated in his arranging for her termination. As noted, he denies all of these accusations.

We start by noting that the City's Human Rights Law does not strictly parallel either federal or state law. Under the Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85, courts must undertake an independent assessment of the evidence based on the more liberal standards embodied in that statute. In relevant part the statute states that it is an "unlawful discriminatory practice" "[f]or an employer . . . because of the . . . gender . . . of any person . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code sec. 8-107(1)(a). As summarized by the Second Circuit, the term "discriminate against . . . in terms, conditions or privileges of employment" encompasses any action that "forc[es] a targeted employee to suffer 'unwanted gender-based conduct' . . . even if the harassing conduct does not rise to the level of being 'severe and pervasive.'" Mihalik v. Credit Agricole Cheuvreux North Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013)(quoting Williams v. New York City Housing Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 38 (1st Dep't 2009)). Thus, "'liability is normally determined simply by the existence of differential treatment.' . . . The plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender,'" id. (quoting Williams, 872 N.Y.S.2d at 39), and "the challenged conduct need not even be 'tangible (like hiring or firing)'". Id. (quoting Williams, 872 N.Y.S.2d at 40). The "severity and pervasiveness" of the conduct is relevant only to the amount of damages. Id. (citing Williams, 872 N.Y.S.2d at 38).

Ms. Rodriguez asserts that she was subjected to unwanted verbal flirtatiousness by Mr. Walters (including at least a one-time expression of love, repeated statements of admiration for her

appearance, invitations to off-site drinks and an overseas trip, comments about his romantic life and other women), as well as offensive grabbing of her waist, an insulting and obscene tirade the day before her termination and, finally, the termination itself, purportedly undertaken in a fit of jealousy. If these allegations were borne out by the evidence, plainly they would constitute violations of the City Human Rights Law.

In a case involving purely the credibility of two interested parties, we look to indicia of credibility. The first and most troubling sign in this case starts with Ms. Rodriguez's assertion, found in her Statement of Claim, that MRG paid her no wages and that she was reliant purely on tips. This version was somewhat modified in her pre-hearing memoranda, in which she claimed that for most of her work weeks she was paid nothing by her employer. Both versions proved to have been false, and we are left to infer that she invented these claims for the purpose of inflating her damages.[35] This blatant dishonesty is, by itself, sufficient to put in substantial doubt her version of events insofar as her account is designed to demonstrate the viability of her discrimination claim.

Some of her testimony on discrete issues adds further doubt as to her reliability. Thus, for example, on cross-examination she was questioned about her use of the expression "bae" in a communication to Mr. Walters. She responded that she did not know what the term meant, even as she was pressed on the fact that it is a recognized expression of affection. Again, her claim of ignorance

_____

[35] Theoretically, it is possible that Ms. Rodriguez accurately advised her attorney otherwise and counsel misunderstood what she was saying, but the record is bare of any suggestion that this was the case, and we have no reason to suspect that able counsel would have misapprehended such a crucial fact, and would have persisted in that error without correction by Ms. Rodriguez at some point. It is also conceivable that Ms. Rodriguez actually believed, albeit incorrectly, that she had not been paid, but this surmise is both unsupported by the record and wildly implausible in any event. She is an experienced restaurant/nightclub employee and her background in a variety of self-described endeavors is inconsistent with her remaining in ignorance of the amount of her pay or its total absence. To the contrary, she seems to have been quite focused on it.

was entirely incredible.[36] Also lacking in credibility is her testimony that, as a result of her termination (which was not her first experience of this kind)[37], she was so emotionally distraught that she was unable to function at all in any work or social setting until the following November, could not face going outdoors for many months, and was rendered so impecunious (despite a scheduled work offer for the summer) that she lost her boyfriend as a result. It also bears mention that, despite her purported indisposition, she stated that she continued to entertain 3,000 followers on Instagram in the face of all of these travails. Finally, we note her admission that when she sought to be rehired for the 2017 summer season she intended to stay only for the Memorial Day weekend because it offered the most lucrative pay, but was fully aware that La Marina understood that she was committing for the entire season. Such willingness to deceive for monetary gain is itself a red flag on truthfulness.

All of that said, there remains the question of whether she has demonstrated by a preponderance of the evidence some or all of the misconduct that she claims was inflicted on her by Mr. Walters. I am satisfied that she has not met her burden.

Claimant paints a picture of Mr. Walters as obsessed with her, to the point of firing her for having apparently mentioned her boyfriend on her Internet posts, but this seems implausible. Of particular note, after Ms. Rodriguez had spent the summer season at La Marina, she departed in September 2016, and did not return until May 27, 2017. In all that intervening time, however, the only noted communications that she seemed to have had with Mr. Walters were an affectionate-seeming inquiry to him as to whether she could bring a friend to La Marina for free drinks, and her misleading

---

[36] "Bae" is described as "a slang term of endearment primarily used among youth in North America. It came into widespread use around 2013 and 2014 through social media and hip-hop and R&B lyrics. It usually refers to a person's romantic partner, especially a boyfriend or girlfriend . . . . It was a runner-up for the Oxford Dictionaries 2014 Word of the Year." Wikipedia, https://en.wikipedia.org/wiki/Bae_(word).

[37] Ms. Rodriguez testified that, some years before, she had been fired by a club at which she had worked as a waitress because one of her tables had successfully protested a credit card charge of approximately $20,000.00. She indicated that the dispute was triggered by the absence of a signature of the cardholder on the credit card slip.

confirmation to him that she wanted to return for the 2017 season. There is no indication that he was attempting to reach out to her, much less seeking to pursue her.[38] This absence of evidence undercuts the narrative about Mr. Walters' extreme focus on Ms. Rodriguez, and it also makes less plausible her account that on her return to La Marina in May 2017 Mr. Walters immediately undertook aggressive measures against her, culminating with her termination, all in a fit of uncontrolled jealousy.

As for Ms. Rodriguez's report that during the 2016 season he frequently grabbed her and did so in the presence of other staff members, we are faced with the previously described doubts about her general credibility. Moreover, her dark version of events is undermined to a degree by the alacrity with she sought to return to La Marina in May 2017, particularly in view of the plethora of other work opportunities that she described as being available to her.[39]

Ms. Rodriguez also cites Mr. Walters' comments to her complimenting her on her appearance or mentioning his experience with women, and we assume that such banter is commonplace in this type of work setting, but again we are left with doubts based on Ms. Rodriguez's credibility issues, as well as the relative triviality of this claimed conduct. See, e.g., Williams, 872 N.Y.S.2d at 41. Simply stated, we are not persuaded that Ms. Rodriguez has proven that Mr. Walters engaged in verbalization during the 2016 season that amounted to a violation of the City Human Rights Law. See, e.g., Russo v. Presbyterian Hosp., 972 F. Supp.2d 429, 450-51 (E.D.N.Y. 2013)("Isolated incidents of unwelcome verbal and physical conduct have been found to constitute the type of 'petty slights and trivial inconveniences' that are not

---

[38] Mr. Walters testified that he followed her and other employees on the Internet, but did so passively during the off-season to catch up on their activities and future availability for La Marina.

[39] We note also that claimant offered only her own testimony and, when asked why she had not proffered the testimony of any of the asserted witnesses, she responded unconvincingly that she had not known that she needed corroboration. Although we are aware of the potential difficulty in obtaining witness cooperation, particularly if the witnesses remain in the employ of the respondents, claimant offered no indication that any effort had been made to procure such cooperation, a possibility that counsel presumably had explored with her client.

actionable even under the more liberal standard of the NYCHL.")(citing & quoting inter alia Magnoni v. Smith & Laquercia, LLP, 701 F. Supp.2d 497, 505-06 (S.D.N.Y. 2010)).

The remaining question concerns the events of May 27-28, 2017. Here, too, we find that Ms. Rodriguez has not demonstrated by a preponderance of the evidence that she was subjected to gender discrimination. The account by Mr. Walters as to his reasons for triggering the termination of claimant's employment involved a congeries of asserted failings on her part, including failure to appear for a mandatory training session, failure to attend a pre-shift meeting on either day, arriving late for work, failure to clock in (resulting from her failure to attend the earlier sessions), ringing up incorrect low prices for a number of her orders (suggesting that she may have been pocketing the difference), texting on her phone during a busy part of the shift, chatting with a security guard during that very busy time as other bartenders strained to meet the customers' demands, and leaving the premises prematurely without having done her required cash reconciliation.[40]

Although not free from doubt, this scenario -- that Mr. Walters was motivated solely by his assessment (accurate or not) of claimant's job performance -- is somewhat more plausible than claimant's alternative version of a love-sick abuser.[41] In this

_____

[40] Of possible significance in assessing Mr. Walters' assertion that claimant arrived late and left early on May 27, 2017 is Cl. Ex. 9, the sheet listing her last payment from La Marina, which was apparently for that day. The sheet specifies that she was being paid for three hours for the day (incorrectly listed as May 29), and she never challenged the accuracy of that calculation of her hours for her last weekend. Indeed, she was quite specific in testifying that the only recorded hours that she was contesting at the hearing were those listed for her first two work weeks in 2016. If in fact she worked only three hours on May 27 -- concededly a very busy day on the Memorial Day weekend -- that would suggest that she was not present for a considerable part of her scheduled shift.

[41] In attacking Mr. Walters' account, Ms. Rodriguez notes that sales records for May 27 indicate that she was not the only bartender to ring up some prices that were lower than the posted beach-section prices. (Cl. Post-Hearing Memo at 3-4). By her account, she may have done so in five transactions but the sales records reflect ten additional underpriced sales, presumably by some other of the many bartenders on staff. While that might

regard we note that Ms. Rodriguez intended to work at La Marina for
only three days, to pick up some quick pay, and therefore could
well have been less motivated to comply with work requirements, as

support an inference that Mr. Walters was targeting her, he may
have been justified in doing so because of the balance of her
questionable behavior that day (including an early departure and
failing to do a cash reconciliation). Moreover, the fact that
others may have also been manipulating pricing may simply suggest
a more widespread problem of bartender misconduct or ineptitude.

     Ms. Rodriguez also suggests that if Mr. Walters was aware of
such improper pricing, he would (or should) have spoken to her at
the time instead of arranging for her firing. In fact, Mr.
Walters was unclear as to when he became aware of the mis-
pricing. At one point he seemed to say that he was able to
monitor cash register transactions in real time but later said
that he had confirmed his suspicions only after the shift was
ended, Ms. Rodriguez had departed without doing the required
reconciliation, and he had checked her cash receipts.

     Claimant further asserts in testimony that in her experience
other employees had arrived late or texted on the job without
being fired. She offered no specific testimony, however,
indicating that employees who were guilty of such an extensive
list of misdeeds as Mr. Walters had leveled at her were
tolerated.

     Ms. Rodriguez also notes that although Mr. Walters testified
that the senior bartender, Mr. Fernandez, had alerted him to the
suspicion that Ms. Rodriguez was seeking to inflate her
compensation, respondents did not call Mr. Fernandez as a
corroborating witness. There was also some question about Mr.
Walters' claim that he had only recommended firing Ms. Rodriguez,
with the ultimate decision made by Mr. Mutovic. That seems
questionable, Ms. Rodriguez suggests, because when she came to
the office to collect her last pay, Mr. Mutovic told her that he
did not know the details of what had occurred and had nothing bad
to say about her (a conversation captured on a recording played
at the hearing). (Cl. Ex. 12). It is possible that Mr. Walters
sought to downplay his ultimate responsibility for the
termination -- though his central role is not disputed -- but it
is also plausible that during Mr. Mutovic's last encounter with
claimant, he deliberately downplayed his knowledge of the reasons
for Ms. Rodriguez's termination in an understandable desire to
defuse what could only be described as a very awkward encounter
with her.

she was planning to absent herself within days. We also observe that when questioned about the termination of other employees, Mr. Walters cited a number of servers and others (both men and women) whom he had terminated for misconduct or failings that were generally within the range of shortcomings that he noted with respect to Ms. Rodriguez.

In sum, we conclude that claimant's gender-discrimination claim fails on the merits.

### III. Entitlement to Attorney's Fees

In the Demand for Arbitration, Ms. Rodriguez sought an award of attorney's fees premised on her assumption that she would prevail on all of her claims. For reasons noted, she has prevailed only on a portion of her wage claims, but that is a victory that justifies deeming her a "prevailing party". N.Y. Labor Law sec. 663(1). See, e.g., Imbeault v. Rick's Cabaret Int'l Inc., 2009 WL 2482134, *1 (S.D.N.Y. Aug. 13, 2009). See also McGrath v. Toys "R" Us, Inc., 3 N.Y.3d 421, 788 N.Y.S.2d 281 (2004)(plaintiff who achieves only partial success may be awarded fees under New York City Human Rights Law)(citing Farrar v. Hobby, 506 U.S. 103 (1992)). We therefore award her attorney's fees for work attributable to her successful claims. N.Y. Labor Law secs. 198(1-a), (1-b) & (1-d); id. sec. 663(1). See, e.g., Galeana, 120 F. Supp.3d at 323 (awarding fees under section 198(1-a)).

### IV. The Attorney Fee Award

Ms. Rodriguez seeks a fee award of $42,765.63. (Schulman May 11, 2018 Letter at 4). That figure reflects 129.3 hours of work by two attorneys billing at an hourly rate of $450.00 and 400.00, respectively, and three paralegals each billed at $125.00, with the resultant initial lodestar then reduced by 15 percent to account for time spent on losing claims. (Id. at 2-4; Schulman May 11, 2018 Decl. at paras. 5-7).[42]

### A. Legal Standards

Claimant prevailed on some of her claims under the New York

---

[42] Counsel arrived at the 129.3 hour total by subtracting 52.3 hours that either were spent exclusively on losing claims or represented time entries that were not properly compensable. ( Schulman May 11, 2018 letter at 2).

Labor Law. Like the FLSA, the Labor Law provides that prevailing plaintiffs are to be awarded "reasonable" fees as well as costs. 29 U.S.C. § 216(b)[43]; N.Y. Labor Law §§ 198(1) & (1-a); id. § 663(1).[44] See, e.g., Torres v. Gristede's Operating Corp., 519 Fed. Appx. 1, 3 (2d Cir. May 22, 2013); Black v. Nunwood, Inc., 2015 WL 1958917, *3-4 (S.D.N.Y. April 30, 2015). Determination of the amount of fees under these statutes is to be made in the discretion of the court and is customarily governed by standards recognized generally for awarding statutorily authorized fees to a prevailing litigant. See, e.g., Ayres v. 127 Restaurant Corp., 201 F.3d 430, 1999 WL 1295335, *1-2 (2d Cir. Dec. 23, 1999); Kim v. Kum Gang, Inc., 2015 WL 3536593, *2 (S.D.N.Y. June 5, 2015); Herrera v. Tri-State Kitchen & Bath, Inc., 2015 WL 1529653, *13-14 (E.D.N.Y. March 31, 2015); Liang Huo v. Go Sushi Go 9th Ave., 2014 WL 1413532, *7 (S.D.N.Y. April 10, 2014).

In assessing an application of this kind, the court should initially derive a so-called lodestar figure, that is, a "presumptively reasonable fee", Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 190 (2d Cir. 2007), based on "(1) a consideration of the number of hours actually spent by counsel and other personnel that are deemed reasonably necessary to the successful outcome for the client and (2) the setting of reasonable hourly rates for counsel, a criterion . . . opaquely described as 'the rate a paying client would be willing to pay.'"[45] Briese Lichttechnik v. Langton, 2010 WL 3958737,

---

[43] Section 216(b) of the FLSA states: "Any employer who violates the [FLSA] shall be liable to the employee or employees affected. . . . The court in such action shall . . . allow a reasonable attorney's fee to be paid by the defendant and costs of the action."

[44] Section 198(1-a) provides that [i]n any action . . . in which the employee prevails, the court shall allow such employee to recover . . . all reasonable attorney's fees . . . ." See also N.Y. Labor Law §§ 198(1-b) & (1-d). Section 663(1) states that a prevailing employee "paid by his employer less than the wage to which he or she is entitled . . . shall recover . . . together with costs all reasonable attorney's fees."

[45] The Supreme Court subsequently articulated a somewhat different description of the goal of the analysis, when it said that "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Perdue v. Kenny A., 559 U.S. 542, 552 (2010).

at *1 (S.D.N.Y. Oct. 4, 2010)(quoting <u>Arbor Hill</u>, 522 F.3d at 190).[46] <u>See also</u> <u>Balestriere v. CMA Trading, Inc.</u>, 2014 WL 7404068, *3 (S.D.N.Y. Dec. 31, 2014)(citing cases). The lodestar is not "conclusive in all circumstances", but "there is 'a strong presumption' that the lodestar figure is reasonable." <u>Perdue</u>, 559 U.S. at 552; <u>accord</u> <u>Millea</u>, 658 F.3d at 166.

### 1. Hourly Rates

To determine the appropriate hourly rates for this purpose, the court "looks to 'the prevailing market rates in the relevant community.'" <u>Perdue</u>, 559 U.S. at 551 (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 895 (1984)). The court may consider rates approved in prior cases and the court's knowledge of reasonable rates in the district. <u>See</u>, <u>e.g.</u>, <u>Galeana</u>, 120 F. Supp.3d at 322 (quoting <u>Farbotko v. Clinton County</u>, 433 F.3d 204, 209 (2d Cir. 2005)).

### 2. The Amount of Compensable Time

In determining how much attorney time should be compensated, the court initially looks to the amount of time spent on each category of tasks, as reflected in contemporaneous time records. E.g., <u>Malletier v. Dooney & Bourke, Inc.</u>, 2007 WL 1284013, at *1 (S.D.N.Y. Apr. 24, 2007)(citing <u>New York Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1142-43, 1147 (2d Cir. 1983)). It then must determine how much of that time was "reasonably expended." <u>Id.</u> (internal quotations omitted); <u>see</u>, <u>e.g.</u>, <u>Briese</u>, 2010 WL 3958737 at *1 . To do so "the court looks to its own familiarity with the case and . . . its experience generally as well as to the evidentiary submissions and arguments of the parties." <u>Clarke v. Frank</u>, 960 F.2d 1146, 1153 (2d Cir. 1992) (internal quotations omitted).

This analysis takes into consideration overstaffing, the skill and experience of the attorneys, as well as redundant, excessive, or unnecessary hours. <u>Id.</u> Courts are to make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended."

---

[46] The term "lodestar" has had a somewhat up-and-down fate in the Second Circuit. After years of usage of this term, the Second Circuit seemed to banish it in the series of <u>Arbor Hill</u> opinions, <u>see</u> <u>Arbor Hill</u>, 522 F.3d at 188-90, but it has since made a comeback after the Supreme Court utilized it without questioning its appropriateness as a descriptor of the required fee analysis. <u>Perdue</u>, 559 U.S. at 559. <u>See</u> <u>Millea v. Metro-North R.R. Co.</u>, 658 F.3d 154, 166-69 (2d Cir. 2011).

Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994). In calculating reasonable hours, the essential consideration is whether a reasonable attorney would have expended similar hours in pursuit of the case. See, e.g., Miroglio S.P.A. v. Conway Stores, Inc., 629 F. Supp.2d 307, 312 (S.D.N.Y. 2009)(citing Grant v. Martinez, 973 F.2d 96, 99 (2d Cir.1992)).

If the court finds that some of the time spent was not reasonably necessary to the outcome, it should reduce the time for which compensation is awarded. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433-37 (1983); Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998). Such reductions are appropriate not only for work on unsuccessful claims and arguments, but also for inefficient or duplicative work. See Hensley, 461 U.S. at 434-35; In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987). "In reducing a claim for time spent, the court may 'use a percentage deduction "as a practical means of trimming fat from a fee application."'" Malletier, 2007 WL 1284013, *1 (quoting McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006)).

### 3. Assessment of the Fee Application

Claimant asserts that the hourly rates sought by her are entirely reasonable in view of the experience and performance of counsel in this case. Both attorneys have extensive experience in litigating these types of cases, and both are partners in their law firm. Moreover, she notes that courts in the past have upheld hourly rates of this size not only for similarly situated counsel in small firms, see, e.g., Tackie v. Keff Enterprises, LLC, 2014 WL 4626229, *7 (S.D.N.Y. Sept. 16, 2014), but for these very attorneys. See Murphy v. Lajaunie, slip op. at 24-25, 13 cv. 6503 (RJS)(SN) (S.D.N.Y. Feb. 2, 2018)(annexed as Ex.3 to Schulman Decl.); Lola v. Skadden, Arps, Meagher, Slate & Flom, LLP, Tr. at 19-20, 13 cv. 5008 (RJS) (S.D.N.Y. Dec. 21, 2015)(annexed as Ex. 2 to Schulman Decl.).

In opposing these requests, respondents note that the cited rates are at the highest end of what courts usually will award experienced counsel in wage-and-hour cases, and that the claims on which Ms. Rodriguez prevailed were quite limited, and were based on a work history of only five or so months. They assert that this scenario presented a very simple case for adjudication, thus distinguishing the decisions cited by claimant. They argue, in substance, that these circumstances do not justify the inference that such rates are necessary to persuade an adequately equipped attorney to handle such a case. (Morrison May 24, 2018 letter at fourth to fifth pages).

34

A number of courts in this district have observed that small-firm experienced counsel in FLSA cases should ordinarily be awarded no more than about $400.00 per hour, e.g., Mendoza v. CGY & J Corp., 2017 WL 4685100, *2 (S.D.N.Y. Oct. 17, 2017); Hernandez v. JRPac, Inc., 2017 WL 66325, *3 (S.D.N.Y. Jan. 6, 2017), though some will award $425.00 or even $450.00 in more demanding cases. E.g., Najera v. 144 Ninth Gotham Pizza, Inc., 2017 WL 728703, *2 (S.D.N.Y. Feb. 24, 2017). Still other courts have suggested that the presumptive maximum award for such counsel in these types of cases should be $450.00. See, e.g., Tackie, 2014 WL 462629 at *7. Moreover, in setting rates, the courts have frequently relied on the relative simplicity or complexity of the case to adjust the hourly rates to be awarded. See, e.g., id.; Mendoza, 2017 WL 4685100 at *2; Sevilla v. Nekasa Inc., 2017 WL 1185572, *5 (S.D.N.Y. March 30, 2017); Galeana, 120 F. Supp. at 322-24.

In this one-claimant case, the claims on which Ms. Rodriguez prevailed were legally and factually quite straightforward. Moreover, the court decisions that counsel cites in which their rates were approved appear to have involved more demanding litigation skills. That said, we view the complexity, or lack thereof, of a case as pertinent principally to the amount of time that should have been required to litigate the successful claims, and we further view the advanced skills of trial counsel as relevant to the question of whether the hours devoted to those claims were reasonable; sophisticated attorneys may be expected to exhibit greater efficiency in handling a given case, whether complex or not. Accordingly, although we reduce the hourly rate of Mr. Kirschenbaum to $400.00, we agree that the far more substantial time devoted to this case by Ms. Schulman should be measured at her regular rate of $400.00. As for the paralegal rates of $125.00, respondents do not pursue a specific challenge, and although these rates are on the high end for this type of case, see, e.g., Gonzalez v. Scalinatella, Inc., 112 F. Supp.3d 5, 28-29 (S.D.N.Y. 2015), we leave them in place.

In assessing the hours claimed by counsel, we start by noting that of the total amount of time spent by attorneys and paralegals, amounting to 182.50 hours, counsel has deducted 53.20 hours, assertedly to correct for the time dedicated exclusively to Ms. Rodriguez's gender claims and for time entries that were not otherwise defensible. The non-excluded time for which fees are sought -- amounting to 129.30 hours -- is said to comprise both time spent exclusively on the wages-and-hours claims and segments of time devoted to both sets of claims but which cannot be readily segregated into hours spent on one of the two categories of claims. To account for non-segregable time that would have been less in the absence of the gender claims, counsel has further reduced the

resulting figure ($50,312.50)[47] by 15 percent, yielding a request for $42,765.63.

In seeking a reduction of this sum, respondents argue principally that the time devoted to the gender claims far outweighed that spent on the wage claims. They also pursue a somewhat convoluted argument to the effect that if claimant had not asserted the failing gender claims and had not insisted, until the eve of the arbitral hearing, that she had been paid no wages by respondents, the case would likely have settled, thus justifying some unstated, but no doubt dramatic, further reduction in the size of a defensible fee award. (Morrison May 24, 2018 letter at third to fifth pages).

We decline to follow respondents on their proposed analytical path about the hypothetical possibility of settlement. Apart from the policy considerations inherent in Fed. R. Evid. 408 and equivalent limitations on the use of settlement discussions (or in this case their absence), we have no factual basis here for making any suppositions about the respondents' "what ifs". Apparently claimant had at some point made a large settlement demand, and it appears that respondents, presumably in command of much of the evidence that would yield a result on both sets of claims, never provided a counter-offer. What that scenario suggests about the promise of a resolution if claimant had been -- in respondents' view -- less ambitious is a complete mystery. It is not surprising, therefore, that the courts addressing fee applications have been unreceptive to the argument that respondents press here -- that the fee applicant's outsized demands in the lawsuit chilled settlement potential and that this circumstance should be weighed in assessing fees. See, e.g., Gonzalez, 112 F. Supp.3d at 19-20 (discussing inter alia Ortiz v. Regan, 980 F.2d 138 (2d Cir. 1992)).

As for the amount of time spent on the successful claims -- which were essentially premised on respondents' failure to provide a filled-in wage notice and weekly pay statements -- we agree that, stripped to their essence, these claims should ordinarily have required far less time to litigate than the hours for which claimant seeks a fee award. Moreover, the page count on the depositions of claimant and Mr. Walters, as well as claimant's original pleading, is consistent with the evident point that the gender claims themselves involved a more elaborate factual narrative, a circumstance that would likely result in more hours being devoted to preparation of that aspect of the case. That said,

---

[47] This figure is premised on a $450.00 hourly rate for Mr. Kirschenbaum.

there were apparent complications in the litigation, apart from the harassment allegations, that required the expenditure of some extra time by counsel, including the work needed to deal with respondents' default in having a corporate representative appear for a noticed deposition and pursuing the production by respondents of their time and pay records, an effort that did not completely end until a few days before the arbitral hearing and that triggered a successful preclusion motion.

In effect, claimant has reduced the hours for which she seeks a fee award from approximately 180 to roughly 110. Given the predominance and impact of the gender issues on the litigating process, we view this reduction as inadequate to account for the failure of these claims. We further note that one key aspect of claimant's wage claims also failed -- her assertion that she had been denied any wages, a claim that, if supported, would have required a substantial award for failure to pay minimum wage. Once that allegation was withdrawn -- essentially on the eve of the arbitral hearing -- the only claims that remained were premised solely on respondents' impermissible taking of a tip credit because of its failure to provide notice, and its failure to provide weekly pay statements. In short, had claimant's no-wage claim not been pressed, some of the attorney time for which claimant seeks compensation would unquestionably not have been needed.

Given the foregoing circumstances, we view the 15 percent deduction from the fee figure calculated by claimant to be insufficient. Recognizing that this assessment is, to put it mildly, impressionistic, we nonetheless will impose a 30 percent reduction in the amount of hours calculated to have been reasonably spent on successful aspects of claimant's case. Including the reduced hourly rate for Mr. Kirschenbaum in the measurement of compensable fees, we arrive at the following fee award:

| Atty/Paralegal | Rate | Hours | Total |
|----------------|------|-------|-------|
| Kirschenbaum | $400.00 | 8.3 | $3,320.00 |
| Schulman | $400.00 | 114.1 | $45,640.00 |
| " | $200.00 | 1.0 | $200.00[48] |
| Turnquest | $125.00 | 5.1 | $637.50 |
| Duran | $125.00 | 0.5 | $62.50 |
| Behbodikhan | $125.00 | 0.3 | $37.50 |
| | | SUB-TOTAL | $49,777.50 |
| | | 30 percent | -$14,933.25 |
| | | TOTAL | $34,844.25 |

In awarding this amount, we recognize that it substantially exceeds the award on Ms. Rodriguez's successful claims. That disparity does not alter the appropriate analysis of the fee application, see, e.g., Gonzalez, 112 F. Supp.3d at 10 (citing cases), and under that analysis the amount awarded is appropriately reflective of the extent of her litigative success and failure.


V. Allocation of JAMS Fees

In respondents' Post-Hearing Memorandum, they asked that we order that the fees charged for this arbitration be split equally between claimant and respondents. (Resp. Post-Hearing Memo at 6th page). That request is denied. JAMS Employment Rule 31(c) specifies that if resort to arbitration is compelled as a condition for the claimant's employment -- as was the case here -- the employee's financial responsibility is limited to paying her share of the JAMS Case Management Fee. The rule does not suggest any basis for exposing an employee to a more substantial financial obligation, and we are aware of none, particularly in a case in which the employee has prevailed to some degree on one or more of her claims.


Conclusion

For the reasons stated, under the New York Labor Law Ms. Rodriguez is awarded $9,069.20 as damages on her claims for failure to pay minimum wages and failure to comply with the notice and pay-statement requirements of N.Y. Labor Law secs. 195(1) & (3). This award is made jointly and severally against all respondents. Claimant is also entitled to receive from respondents MRG and Rosen a payment of $185.00, in compensation for the court reporter

---

[48] The one hour is claimed for travel time at a 50 percent reduction from Ms. Schulman's regular fee. Respondents do not contest this figure.

appearance fee incurred in scheduling a deposition of MRG by respondent Rosen that respondents and their counsel failed to attend. (See Scheduling Order No. 3 & Scheduling Order No. 4 at para. 6).

Ms. Rodriguez is also entitled to an award of statutory interest of nine percent on her unpaid wages. That interest is to run from July 7, 2016 for unpaid 2016 wages and from May 27, 2017 for unpaid 2017 wages, with interest terminating on the earlier of judicial confirmation of this Award or its satisfaction.

Finally, claimant is awarded attorney's fees in the amount of $34,844.25 for time spent in litigating the successful Labor Law claims. This award is also made jointly and severally against all respondents.

All of claimant's other claims are dismissed.

The parties are to bear their own costs.

Dated: May 28, 2018

Michael H. Dolinger
Arbitrator


Copies of the foregoing Final Arbitral Award have been sent this day to:

Denise A. Schulman, Esq.
Joseph & Kirschenbaum LLP
32 Broadway
Suite 601
New York, New York 10004
denise@jhllp.com

Lawrence Morrison, Esq.
Robert L. Kraselnik, Esq.
Morrison Tenenbaum PLLC
87 Walker Street
2d Floor
New York, New York 10013
lmorrison@m-t-law.com

## SERVICE LIST

**Case Name:** Rodriguez, Connie vs. Manhattan River Group, et al.

**Reference #:** 1425024437

**Panelist:** Dolinger, Michael H.,

**Hear Type:** Arbitration

**Case Type:** Employment

---

### Maimon Kirschenbaum

Joseph & Kirschenbaum LLP

Maimon Kirschenbaum
32 Broadway
Suite 601
New York, NY  10004
maimon@jhllp.com

Claimant
Phone: (212) 688-5640
Fax: (212) 688-2548

**Party Represented:**
Connie Rodriguez

### Lawrence Morrison

Morrison Tenenbaum, PLLC

Lawrence Morrison
87 Walker Street, Floor 2
New York, NY  10013
lmorrison@m-t-law.com

Respondent
Phone: (212) 620-0938
Fax: 646-998-1972

**Party Represented:**
Andrew Walters
Jerald Tenebaum
Josh Rosen
Manhattan River Group

### Denise Schulman

Joseph & Kirschenbaum LLP

Denise Schulman
32 Broadway
Suite 601
New York, NY  10004
denise@jhllp.com

Claimant
Phone: (212) 688-5640
Fax: (212) 688-2548

**Party Represented:**
Connie Rodriguez

### Jerald Tenenbaum

Morrison Tenenbaum, PLLC

Jerald Tenenbaum
87 Walker Street, Floor 2
New York, NY  10013
jerald@m-t-law.com

Respondent
Phone: (212) 620-0938
Fax: (646) 390-5095

**Party Represented:**
Andrew Walters
Jerald Tenenbaum
Josh Rosen
Manhattan River Group

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Rodriguez, Connie vs. Manhattan River Group, et al.
Reference No. 1425024437

I, Vickie Johnston, not a party to the within action, hereby declare that on  May 3, 2019, I served the attached Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Maimon Kirschenbaum Esq.
Denise Schulman Esq.
Joseph & Kirschenbaum LLP
32 Broadway
Suite 601
New York, NY  10004
Phone: (212) 688-5640
maimon@jhllp.com
denise@jhllp.com
   Parties Represented:
   Connie Rodriguez

Lawrence Morrison Esq.
Jerald Tenenbaum Esq.
Morrison Tenenbaum, PLLC
87 Walker Street, Floor 2
New York, NY   10013
Phone: (212) 620-0938
lmorrison@m-t-law.com
jerald@m-t-law.com
   Parties Represented:
   Andrew Walters
   Jerald Tenebaum
   Jerald Tenenbaum
   Josh Rosen
   Manhattan River Group

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on  May 3, 2019.

_____
Vickie Johnston
VJohnston@jamsadr.com